## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LEO ALOYSIUS COLGAN and ANA MARIA TENORIO MEJIA, *Plaintiffs*, | ) ) ) | 3:24-CV-0591 (SVN) |
| | ) | |
| v. | ) ) | |
| GARLAND et al., *Defendants*.[1] | ) ) ) ) | September 30, 2025 |

### RULING AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Sarala V. Nagala, United States District Judge.

After they married in 2017, Plaintiffs Leo Aloysius Colgan, an American citizen, and Ana Maria Tenoria Mejia, a Colombian citizen, sought lawful immigration status for Mejia through a United States Citizenship and Immigration Services ("USCIS") I-130 Petition for Alien Relative. Immigration authorities denied the petition, finding that Mejia had previously entered into a sham marriage to another individual, Jessica Castro.

Plaintiffs originally filed suit in 2021, alleging that immigration authorities had acted arbitrarily and capriciously and violated their rights to due process when denying the petition. *See Colgan v. Garland*, No. 3:21-CV-1633 (SVN) ("*Colgan I*"). Following a stipulated resolution that required a deposition of Castro, USCIS reopened and readjudicated the petition. USCIS again denied it, and this renewed suit followed ("*Colgan II*").

Presently before the Court are the parties' supplemental cross-motions for summary judgment, which incorporate the arguments made in their summary judgment motions in *Colgan*

---

[1] The Clerk is directed to substitute the following Defendants for the original Defendants, given that each now has a successor in office: Attorney General Pamela Bondi for Merrick Garland; Secretary of the Department of Homeland Security Kristi Noem for Alejandro Mayorkas; Director of the U.S. Citizenship and Immigration Services ("USCIS") Joseph B. Edlow for Ur Jaddou; and USCIS Buffalo District Director M. Frances Holmes for Carmen Whaling. *See* Fed. R. Civ. P. 25(d).

*I.* As in *Colgan I*, Plaintiffs urge the Court to find that Defendants' determination denying the I-130 petition was arbitrary and capricious; Defendants disagree.[2]

For the reasons set forth below, Defendants' supplemental motion for summary judgment, ECF No. 20, is GRANTED, and Plaintiffs' supplemental motion for summary judgment, ECF No. 21, is DENIED.

## I.    THE MARRIAGE FRAUD BAR

Under the immigration laws, a United States citizen is allowed to file an I-130 petition for adjustment of status for a non-U.S. citizen immediate family member, such as a spouse. *See* 8 U.S.C. § 1154.  Such a petition provides significant advantages to the beneficiary, such as being exempt from the "worldwide levels or numerical limitations on immigration" to which other immigrants would be subject. *Simko v. Bd. of Immigr. Appeals*, 156 F. Supp. 3d 300, 309 (D. Conn. 2015) (internal citations omitted).  Once such an application is filed, the Secretary of the Department of Homeland Security[3] investigates the facts of the case and, "if [the agency] determines that the facts stated in the petition are true and that the alien in behalf of whom the petition is made is an immediate relative," it shall approve the petition.  8 U.S.C. § 1154(b).

Crucially, however, "no petition shall be approved if (1) the alien has previously been accorded, or has sought to be accorded, an immediate relative or preference status as the spouse of a citizen of the United States . . . by reason of a marriage determined by the Attorney General to have been entered into for purpose of evading the immigration laws." *Id.* § 1154(c).  When

---

[2] In *Colgan I*, Plaintiffs advanced a claim that they were denied due process because they were not given the opportunity to examine and rebut "adverse evidence" within USCIS's file. *Colgan I*, Third Am. Compl., ECF No. 30 at 7, ¶¶ 38–39.  The complaint in the instant matter references a due process violation in passing in paragraph 11, but does not reference a due process violation in its "Claims" section.  *See Colgan II*, Compl., ECF No. 1, ¶¶ 11, 37–42.  Thus, although it is not clear Plaintiffs are continuing to pursue a due process claim in the instant case, the Court will address the due process claim in this ruling, in an abundance of caution.

[3] The statute originally granted this authority to the Attorney General; when the Department of Homeland Security was created, however, the responsibility for this investigation and determination was given to the Secretary of the Department of Homeland Security.  *See* 6 U.S.C. § 202(4).

determining whether the marriage fraud bar applies, it does not matter if the alien received the benefit sought through the fraudulent marriage, or "was convicted of or even prosecuted for, the attempt or conspiracy." 8 C.F.R. § 204.2(a)(1)(ii). Rather, as long as there is "substantial and probative evidence" of an attempt or conspiracy "to enter into a marriage for the purpose of evading immigration law," and that evidence is contained in the alien's file, the "director will deny a petition for immigrant visa classification." *Id.*

The marriage fraud bar is "very serious, as it is nonwaivable and perpetual in duration." *Simko*, 156 F. Supp. 3d at 310. Therefore, the Second Circuit has been clear that "[t]he finding of a fraudulent marriage must be supported by 'substantial and probative' evidence 'documented in the alien's file.'" *Singh v. Bd. of Immigr. Appeals*, 724 F. App'x 36, 37–38 (2d Cir. 2018) (summary order) (citing *Matter of Tawfik*, 20 I&N Dec. 166, 167 (B.I.A. 1990)). The evidence must do more than create a mere inference of fraud, as "a reasonable inference does not rise to the level of substantial and probative evidence." *Id.* (quotation marks omitted). In making this determination, certain types of evidence are considered more probative than others. Specifically, the following types of evidence are considered especially probative for the determination of whether a marriage was entered for fraudulent purposes:

> contradictions in the petitioner's statement regarding the living arrangements of the parties, inconsistencies between the statements of the petitioner and the beneficiary, and proof that the beneficiary has been listed as the petitioner's spouse on any insurance policies, property leases, income tax forms, or bank accounts; and testimony or other evidence regarding courtship, wedding ceremony, shared residence and experiences.

*Id.* (internal quotation marks omitted). Ultimately, "the central question is whether the [couple] intended to establish a life together at the time they were married." *Risoli v. Nielsen*, 734 F. App'x 61, 62 (2d Cir. 2018) (citing *Matter of Soriano*, 19 I&N Dec. 764, 765 (B.I.A. 1988)). If USCIS determines that substantial and probative evidence that a prior marriage was fraudulent exists, then

"the burden shifts to the petitioner to establish that the beneficiary did not seek . . . status based on a prior fraudulent marriage." *Id.* (quotation marks and citation omitted).

## II.    FACTUAL BACKGROUND[4]

### A.    Mejia's Prior Marriage and I-130 Petition

Mejia is a citizen of Colombia. Pls.' L.R. 56(a)2 St., ECF No. 38-1, ¶ 1.[5]  In December of 2014, Mejia met Jessica Castro at a Christmas party. *Id.* ¶ 2.  Castro asked Mejia to marry her on or around Easter of 2015, and they married on May 29, 2015. *Id.* ¶¶ 3–4.

In December of 2015, Castro filed a USCIS I-130 petition for Alien Relative, to seek lawful immigration status for Mejia. *Id.* ¶ 5.  As part of this application, Castro filed a sworn statement describing her marriage to Mejia and detailing the *bona fides* of their relationship. Defs.' L.R. 56(a)2 St., ECF No. 37-1, ¶ 7.  At the same time, Mejia filed an I-485 Application to Adjust Status. Pls.' L.R. 56(a)2 St. ¶ 6.

In connection with adjudication of the I-130 petition, Castro and Mejia appeared for an interview with USCIS on May 23, 2016. *Id.* ¶ 7.  During this interview, Mejia and Castro were separated and asked questions about their relationship. *See id.* ¶ 10 (disputing a fact alleged by Defendants on the grounds that Mejia and Castro were "separated during the [I-130] interview"). In response to these questions, several of the answers provided by Mejia and Castro did not match. *Id.* ¶¶ 8–59.  While the parties take the time to step through each of these inconsistencies in their

---

[4] The Court has utilized the parties' Local Rule 56 Statements from *Colgan I* to set forth the facts. *See Colgan I*, ECF Nos. 37-1, 38-1.  Many of the facts are undisputed.  Where the facts are admitted or otherwise undisputed, the Court cites only to that Local Rule 56(a)2 statement that contains the relevant fact.  In Plaintiffs' Local Rule 56(a)2 statement, however, there are several facts that Plaintiffs note they "cannot admit or deny."  Such responses do not present evidence rebutting the Defendants' undisputed fact, but simply state Plaintiffs have no knowledge as to the issue. Thus, where Plaintiffs have made only a response of this type, and Defendants' assertion is supported by evidence in the record, the Court deems the fact admitted for purposes of summary judgment.  *See* D. Conn. L. Civ. R. 56(a)3.

[5] Plaintiffs' Local Rule 56(a)2 statement bears the heading "Defendants' Local Rule 56(A)(1) Statement." *See Colgan I*, ECF No. 38-1 at 1.  Nevertheless, it is clear to the Court that this document, submitted with Plaintiffs' opposition to Defendants' motion for summary judgment is, in reality, *Plaintiffs'* Local Rule 56(a)2 statement.  Thus, the Court will refer to it as such.

Local Rule 56(a) Statements, at this time it is sufficient for the Court to report that there were numerous inconsistencies of varying severity. To the extent any of these specific questions are relevant to the Court's analysis, they will be examined in more depth below. What is crucially important, however, is that, at some time during her interview, Castro stated:

> Ana [Mejia] and I are very close friends, and I am sorry I lied about the marriage. I wasn't forced to do this, we looked online for the questions. It's not a safe place for her to go back and I depend on her help with my children. I'm sorry. We are not in a legit marriage. She asked me if she needed to pay she could. I said no payment. She told me I'd be her help for her Green Card.

*Id.* ¶ 59.

USCIS subsequently determined that the marriage between Castro and Mejia was fraudulent. *Id.* ¶ 60. USCIS made this finding based on the "inconsistent answers and lack of bona fide" relationship between Castro and Mejia. *Id.* Thereafter, Castro withdrew the I-130 petition and, on June 13, 2016, Mejia's I-485 application was denied due to the determination that she "entered into a fraudulent marriage in an attempt to obtain an immigration [benefit]." *Id.* ¶ 61 (citing *Colgan I*, Record of Proceedings, ECF No. 28-4 at 26). A few months later, in November of 2016, Castro and Mejia divorced. *Id.* ¶ 62.

   B. <u>Mejia's Second Marriage and I-130 Petition</u>

In July of 2016, before the divorce was finalized, Mejia began dating Colgan. *Id.* ¶ 63. In June of 2017, Mejia and Colgan married. *Id.* ¶ 64. They later had a second, more formal wedding in a church. *Id.* ¶ 65.

On August 17, 2017, Colgan filed an I-130 petition for Mejia. *Colgan I*, ECF No. 28-2 at 77–79. On July 24, 2019, USCIS issued a notice of intent to deny ("NOID") Colgan's petition. Pls.' L.R. 56(a)2 St. ¶ 68. The NOID discussed the reasons why the petition was being denied and

allowed Plaintiffs an opportunity to submit additional evidence that resolved the deficiencies addressed in the NOID.  *Id.* ¶¶ 69, 70; *Colgan II*, ECF No. 1-1.

The NOID explained that USCIS had determined Mejia's previous marriage to Castro had been fraudulently entered in an attempt to obtain an immigration benefit.  Pls.' L.R. 56(a)2 St. ¶ 70.  In reaching this conclusion, the NOID discussed the history of Castro's I-130 petition for Mejia, Plaintiffs' interviews in connection with Colgan's I-130 petition, a telephonic interview with Castro, and a letter submitted in support of the previous I-130 petition by a third party.  *See Colgan II*, ECF No. 1-1.  First, USCIS noted that both Mejia and Colgan were asked about Mejia's prior marriage in their interviews concerning Colgan's petition, and both stated that it was a legitimate marriage that did not work out.  Pls.' L.R. 56(a)2 St. ¶¶ 72, 73.

USCIS then detailed an April 2019 telephone conversation with Castro about the previous marriage.  *Id.* ¶ 74; *Colgan II*, ECF No. 1-1 at 3.  During this conversation, Castro informed USCIS that the previous marriage was arranged by individuals named Michael Werner and Michelle Corrales, with whom Castro was living at the time.  Pls.' L.R. 56(a)2 St.  ¶ 75; *Colgan II*, ECF No. 1-1 at 3.  Castro reported that Werner and Corrales asked her to help Mejia by filing the I-130 and, in exchange, Mejia would help Castro with Castro's childcare responsibilities.  Pls.' L.R. 56(a)2 St.  ¶ 76.  Castro also stated that, while she was married to Mejia, they each had their own separate rooms, that she did not know if Mejia was homosexual or bisexual, and that she did not know much at all about Mejia because they "did their own thing."  *Id.* ¶¶ 77–79.  Castro denied that she was given any monetary payment for the arrangement, but did believe that Werner and Corrales were given some amount of money, although she was unsure of the amount.  *Id.* ¶ 81.

In addition to these conversations, USCIS reviewed the previous I-130 file that was submitted by Castro, including a letter in support of Castro's petition submitted by Corrales; noted

that Plaintiffs' counsel had attempted to discredit the testimony of Castro; and concluded that Plaintiffs did not provide additional documentation demonstrating the legitimacy of Mejia's previous marriage or any evidence to discredit Castro's testimony.  *Id.* ¶¶ 82–87.

Ultimately, in the NOID, USCIS determined there was substantial and probative evidence that Mejia's previous marriage was fraudulent and entered into for the purpose of circumventing the immigration laws.  *Id.* ¶ 88.  Thus, USCIS believed that, under § 204(c) of the Immigration and Nationality Act, it was prohibited from approving Colgan's I-130 petition.  *Id.* ¶ 89.

After the NOID was issued, Plaintiffs were given thirty days to provide additional evidence to "resolve the deficiencies."  *Id.* ¶ 90.  On August 22, 2019, Plaintiffs' counsel provided a letter and additional evidence.  *Id.* ¶ 91.  This evidence included an affidavit by Corrales detailing disreputable behavior by Castro, including abusing medication and abandoning her children.  *Id.* ¶ 94.  Plaintiffs also submitted an affidavit from Mejia detailing the relationship history between her and Castro, and Castro's abuse of Ritalin and/or Adderall.  *Id.* ¶¶ 95–100.  Plaintiffs also provided a private investigator's report about Castro, several more affidavits from friends, a Valentine's Day card Castro had given to Mejia, a copy of the appointment of the grandmother of Castro's children as their permanent guardian, and a Connecticut Superior Court parenting education form signed by Mejia.  *Id.* ¶¶ 101–13.

After receiving all of this information, on April 28, 2020, USCIS sent a letter to Plaintiffs informing them that it had denied the petition.  *Id.* ¶ 114.  This denial letter discusses the evidence submitted by Plaintiffs and describes the evidentiary weight USCIS perceived each piece of evidence to have and why.[6]  *Id.* ¶ 115 –119.  Ultimately, the denial letter stated that Plaintiffs had failed to meet their burden of proof of demonstrating the petition should be approved and that there

---

[6] As with the examination of the discrepancies between Castro and Mejia's interview answers, the Court will examine USCIS's conclusions regarding the probative value of the various pieces of evidence below, to the extent necessary.

remained substantial and probative evidence that Mejia's first marriage had been fraudulently entered to circumvent the immigration laws. *Id.* ¶¶ 120–21. Plaintiffs appealed to the Board of Immigration Appeals ("BIA"), which affirmed the agency's decision and dismissed the appeal. *Colgan II*, BIA Decision, ECF No. 1-4. *Colgan I* followed.

### C. *Colgan I*

In *Colgan I*, Plaintiffs alleged that immigration authorities had acted arbitrarily and capriciously in denying Colgan's I-130 petition, and that their due process rights had been violated because they were not given the opportunity to examine and rebut "adverse evidence" within USCIS's file when responding to the NOID—specifically, Castro's statement during her interview with immigration authorities that the marriage was fraudulent and a "complete text or record" of the phone call with Castro in April of 2019. *Colgan I*, ECF No. 30; *Colgan I*, Pls.' Mot. for Summ. J., ECF No. 36 at 13–14.

The parties briefed cross-motions for summary judgment, and the Court held oral argument on the motions on April 20, 2023. *See id.*, ECF Nos. 35, 38, 41. Following oral argument, the parties agreed to mediate the dispute with U.S. Magistrate Judge Joan Margolis. *See id.*, ECF No. 42. The parties then reached a joint stipulation, under which: (1) Plaintiffs would schedule a deposition of Castro within 90 days; (2) if Castro's deposition testimony "cast doubt" on her prior statements to USCIS, USCIS would reopen Colgan's petition and readjudicate it based on all available evidence, "but ma[d]e no guarantee as to the outcome of the adjudication"; (3) if Castro's deposition testimony did not cast doubt on her prior statements, the Court would adjudicate the pending summary judgment motions without further briefing or argument; and (4) if the parties could not agree on whether Castro's deposition testimony cast doubt on her prior statements, the

parties would submit the deposition transcript to Judge Margolis for a determination on that issue. *Id.*, ECF No. 45-1.

The deposition went forward on July 7, 2023. *See Colgan II*, Castro Dep. Tr., ECF No. 20-1. Following the deposition, the parties disagreed about whether Castro's testimony cast doubt on her prior statements to USCIS, so Judge Margolis examined the transcript. The deposition testimony is discussed below. In a sealed order, Judge Margolis found that Castro's testimony did cast doubt on her prior statements to USCIS, and thus she ordered that Colgan's petition be reopened and readjudicated, as required by the parties' joint stipulation. *Colgan I*, Sealed Order, ECF No. 49.

Following the reopening of the petition, USCIS examined "the evidence and testimony provided at the interview, including all evidence provided in response to the [NOID], the BIA, and the U.S. District Court, but excepting Jessica [Castro's] prior statements and any analysis of such statements found in previous NOIDs or decisions," and reached the same conclusion it had previously reached: that Colgan's I-130 petition must be denied. *Colgan II*, Mar. 5, 2024, USCIS Decision, ECF No. 1-5. The present suit, *Colgan II*, followed.

D. *Colgan II*

Plaintiffs' complaint in *Colgan II*, like their complaint in *Colgan I*, alleges that USCIS's decision to deny the petition was arbitrary and capricious. *See Colgan II*, ECF No. 1. As noted above, the Court also construes the complaint as alleging a due process violation.

The action proceeded directly to cross-motions for summary judgment, in which the parties incorporated the arguments made in their *Colgan I* summary judgment briefing. Plaintiffs originally advanced an argument that USCIS had employed an incorrect legal standard in

readjudicating the petition, but withdrew that argument. *See Colgan II*, Pls.' Opp'n Br., ECF No. 26 at 1.

## III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When examining the record, "the court must resolve all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992). "[O]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

Here, the parties do not dispute the genuineness of the documents in the Record of Proceedings, and generally do not raise factual disputes. Thus, the Court's consideration of the parties' cross-motions for summary judgment will focus on the legality of the agency's decision in this case, not on the existence or nonexistence of disputed issues of material fact. *See Simko*, 156 F. Supp. 3d at 307.

## IV.    ARBITRARY AND CAPRICIOUS DECISION

The Court first holds that USCIS's decision to deny Colgan's petition was not arbitrary and capricious and thus need not be set aside.

A. <u>Legal Standard</u>

The Court is empowered to review the determinations of federal agencies under 5 U.S.C. § 706. As relevant to this action, this statute mandates that a court reviewing an agency's action, findings or conclusions shall "hold unlawful and set aside" any determinations that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706 (2)(A)–(B). Under this standard, a court's scope of review is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Specific to the context of I-130 petitions, "'appropriate deference must be accorded [USCIS's] decisions' in light of the widespread fraud associated with immediate-relative petitions." *Egan v. Weiss*, 119 F.3d 106, 107 (2d Cir. 1997) (quoting *INS v. Miranda*, 459 U.S. 14, 18–19 & n.4 (1982) (*per curiam*)). In sum, the decision of the agency will be set aside only when it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Cnty. of Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 802 F.3d 413, 431 (2d Cir. 2015).

Defendants contend that their decision to deny Colgan's petition was neither arbitrary nor capricious, given that, in their view, there was substantial evidence supporting their determination that Mejia's prior marriage to Castro was fraudulent. The Court's review of this question proceeds in two phases. First, the Court must determine whether USCIS acted arbitrarily and capriciously in determining that substantial and probative evidence of marriage fraud existed. *See Simko*, 156

F. Supp. 3d at 310.  Second, the Court must examine whether USCIS's determination that Plaintiffs failed to rebut this finding was arbitrary and capricious.  *See id.*

    B.   <u>Substantial and Probative Evidence</u>

The Court holds that USCIS's determination that there was substantial and probative evidence of marriage fraud was neither arbitrary nor capricious.

    *1.  Original Determination*

To start, the NOID was supported by substantial and probative evidence of marriage fraud. The NOID was based in large part on two admissions from Castro that her marriage to Mejia was not legitimate.  *See Colgan II*, ECF No. 1-1.  First, during Castro's interview with USCIS as part of her I-130 application, she told the USCIS officer that the marriage was not legitimate and that she had only entered the marriage because Mejia promised to assist her with her childcare obligations.  *Id*. at 2.  After giving this statement, Castro withdrew her I-130 petition.  *Id.*

Sometime later, while investigating Colgan's I-130 petition, USCIS attempted to contact Castro regarding her prior statement that her marriage to Mejia was not legitimate.  *Id.* at 3. Immigration officers were able to reach Castro via phone and, during that conversation, Castro once again stated that her marriage to Mejia was entered for purposes of evading immigration regulations.  *Id.*  This conversation also provided further information.  Specifically, Castro stated that when the father of her children passed away, his sister, Michelle Corrales, offered for Castro to stay with Corrales and her husband, Michael Werner.  *Id.*  Castro noted that Mejia was Werner's cousin.  *Id.*  Castro moved in with Corrales and Werner, who then asked Castro to help Mejia by "marrying her and petitioning for her," and in exchange, Mejia would help Castro "with child care."  *Id.*  Castro agreed, and Mejia moved in with Castro, Corrales, and Werner; Castro stressed, however, that she and Mejia never shared a bedroom or had an intimate relationship, and that the

marriage took place solely as an exchange of immigration benefits for help with childcare. *Id.* Castro stated that she was aware of payment between Mejia and Corrales/Werner, but she was unsure of the amount. *Id.*

The NOID also pointed to differences in the answers provided by Castro and Mejia during their I-130 interviews. *Id.* at 2. While the Defendants point to numerous inconsistencies in these interviews, the Court feels obligated to note that it does not believe these inconsistencies all carry the same evidentiary weight. For example, the Defendants point to the fact the Mejia stated she left for work at 6:30 am the previous day, while Castro said Mejia left for work instead at 6:00 am. *Colgan I*, Pls.' L.R. 56(a)2 St. ¶¶ 51, 52. Such a small difference in memory about what time someone left for work carries very little weight in proving that a marriage was not legitimate. Conversely, however, the Court believes that certain inconsistencies are more probative. Specifically, Castro and Mejia did not agree on the location of the proposal, *id.* ¶¶ 40, 41, or whether Mejia received a ring during the proposal, *id.* ¶¶ 45, 46. Regardless of the particular weight each inconsistent answer carried, the parties do not dispute that USCIS relied, at least in part, on these inconsistencies when determining Mejia's marriage to Castro was not legitimate.

Finally, the NOID examined the evidence submitted by the Plaintiffs, as well as their testimony given during the I-130 interviews. The NOID determined that Plaintiffs did not submit additional documents demonstrating that Mejia's marriage to Castro was not entered into to obtain an immigration benefit or discrediting the testimony Castro gave to government officials on two occasions. *Colgan II*, ECF No. 1-1 at 3.

Based on this evidence, the Court believes that USCIS's original decision in the NOID was not arbitrary and capricious. To start, Castro expressly disclaimed the legitimacy of the initial marriage, while also admitting that she was aware of—and complicit in—the scheme. Courts in

this district have found that statements by a former spouse, especially where the spouse admits complicity in the scheme, to be probative of the question of whether a marriage was legitimate. *Cf. Joseph F. Risoli P.E., LLC v. Johnson*, 274 F. Supp. 3d 88, 92 (D. Conn. 2017); *see Codling v. Nielsen*, No. 3:17-CV-2082 (JBA), 2019 WL 612213, at *4 (D. Conn. Feb. 13, 2019).

Moreover, this was not the only evidence upon which the agency relied. Indeed, the NOID also cited inconsistencies in the interviews of Castro and Mejia, as well as the lack of any evidence presented by Plaintiffs that the marriage of Castro and Mejia was legitimate. The Second Circuit has found such inconsistencies and lack of affirmative evidence to be substantial and probative evidence that a marriage was not *bona fide*. *See Singh*, 724 F. App'x at 38. Therefore, the Court finds "a reasonable mind might accept the conclusion that [Mejia's] first marriage was entered into for the purpose of evading the immigration laws" and, thus, the USCIS notice of intent to deny the petition was supported by substantial evidence, and was not arbitrary or capricious. *See Koffi v. Holder*, 487 F. App'x 658, 660 (2d Cir. 2012) (summary order).

### 2. *Plaintiffs' 2019 Rebuttal Evidence*

The Court further holds that the agency did not act arbitrarily or capriciously in determining that Plaintiffs failed in 2019 to rebut its view that Mejia's prior marriage was fraudulent.

First, the eight pieces of evidence that Plaintiffs submitted in response to the NOID in 2019 are insufficient to disturb the agency's conclusion. The evidence consisted of several sworn affidavits, including a statement from Corrales, as well as a private investigator's report on Castro, a custody appointment letter, a copy of a Valentine's Day card from Castro to Mejia, and a court order requiring that Mejia and Castro attend parenting education. *Colgan II*, NOID Response Letter & Attachments, ECF No. 1-2. In the April 28, 2020, notice of decision, USCIS walked through each of these pieces of evidence and discussed precisely the weight it assigned to each

and why. *Colgan II*, USCIS Decision, ECF No. 1-3. USCIS determined that none of this evidence demonstrated that Mejia's marriage to Castro was a *bona fide* marriage. *Id.* at 4–5.

The Court disagrees with Plaintiffs' argument that the agency ignored certain evidence presented by Plaintiffs in opposition and failed to provide Plaintiffs relevant evidence, such that they were unable to adequately respond. First, it is uncontested that Plaintiffs did not provide any documentary evidence of the type that has been recognized to demonstrate that the marriage was *bona fide*. As described above, evidence that a marriage is legitimate can come in many forms, such as proof that the beneficiary has been listed as the petitioner's spouse on insurance policies, property leases, income tax forms, or bank accounts. *See Singh*, 724 F. App'x at 38–39. Plaintiffs did not submit any of these types of documents. While Plaintiffs did submit testimony regarding Mejia and Castro's relationship, courtship, and other marital experiences, s*ee id.* (noting that "testimony or other evidence regarding courtship, wedding ceremony, shared residence, and experiences" may establish that a marriage is not fraudulent), "the agency has significant discretion over the weight to be afforded to the evidence before it." *id.* at 39; *Egan*, 119 F.3d at 108–09 (finding that the agency is not required to "accept the truth of the self-serving statements contained in the various affidavits submitted" by the plaintiffs). In determining that the evidence submitted in opposition to the NOID did not show Mejia's first marriage was a *bona fide* one, USCIS explained its reasoning as to each piece of evidence submitted, ultimately concluding that, while much evidence was submitted in an effort to discredit Castro, Plaintiffs failed to carry their burden of proving Mejia's previous marriage was *bona fide*. *Colgan II*, ECF No. 1-1 at 4. Based on the reasons discussed by USCIS in its decision, and the deference afforded to the agency's weighing of the evidence, the Court cannot find that its analysis of the evidence was arbitrary and capricious.

Plaintiffs' argument that USCIS ignored Castro's sworn statement that the first marriage was *bona fide*, and instead focused only on her statement that it was not, is without merit. It is undisputed that during Castro's interview related to her I-130 petition, she admitted that her initial sworn statement regarding the marriage was false, and that she ultimately withdrew her petition. Pls.' L.R. 56(a)(1) St. ¶ 59. As Castro withdrew her original statement and subsequently represented it was false on multiple occasions, it defies logic to suggest that USCIS should nonetheless have afforded that statement significant weight when determining whether the marriage was a *bona fide* one. Therefore, USCIS's failure to consider Castro's sworn statement in the later withdrawn I-130 petition does not make its findings arbitrary and capricious.

Finally, Plaintiffs argue that because they were not actually given the entire statements made by Castro when she informed USCIS that the marriage was not legitimate, the decision reached was arbitrary and capricious. This argument warrants little discussion. The Second Circuit has held that Plaintiffs "need only be 'advised of' the derogatory information in the case of an adverse decision. 8 C.F.R. § 103.2(b)(16)(i). The actual documents are not required to be disclosed." *Koffi*, 487 F. App'x at 660. Here, Plaintiff does not dispute that they were put on notice of the information USCIS was relying on in considering an adverse determination. That they were not provided the entire documents actually relied upon does not make the decision arbitrary and capricious.

### 3.  Castro's Deposition Testimony

The Court reaches the same conclusion with respect to the agency's 2024 readjudication of Colgan's petition following Castro's deposition. It cannot conclude that the agency's decision to again apply the marriage fraud bar was arbitrary or capricious.

In reevaluating the petition, USCIS considered "all the available evidence" submitted by Plaintiffs, including Castro's deposition testimony, but excluding prior statements she had made to the agency. *Colgan II*, ECF No. 1-5 at 2. The agency relied heavily upon the deposition transcript, and summarized Castro's testimony in relevant part:

> Jessica testified that she met Ana [Mejia] through Michele and Michael. Jessica also testified that she never said she was in love with Ana, never dated Ana, and never had intimate relations with Ana. Jessica stated that Michele and Michael came to her and suggested they could help each other out, as Jessica was raising three children alone and that Ana needed legal immigration status.

*Id.* The agency noted that although Jessica was "unable to provide specific details about the conversations she had with Michele and Michael, nor was she able to identify documents allegedly submitted or written by her with the I-130 petition she filed for Ana," she further testified that the documents "were to support the false claim that she and Ana were in a legitimate marriage." *Id.* In addressing Castro's lack of recollection of the relevant events, the agency concluded that the passage of time and Castro's drug abuse during the pertinent period "does not automatically negate the underlying premise that the marriage was entered into for immigration purposes, and Jessica remained consistent throughout the deposition that the purpose of the marriage was for Ana to obtain lawful permanent resident status." *Id.* at 2–3. The agency found Castro's testimony should be given "great evidentiary weight," given that she was under oath during the deposition; she was told by Plaintiffs' attorney that lying under oath could result in imprisonment and/or fines; and she still "maintained that she entered into a sham marriage, knowing that doing so could result in criminal prosecution." *Id.* at 3.

The agency's summary of Castro's testimony is generally accurate. *See Colgan II*, Castro Dep. Tr., ECF No. 20-1; ECF No. 21-1 (same). It is true that Castro was unable to recall specific events and documents, and that she was abusing substances during the relevant period. She

nonetheless testified that her marriage to Mejia came about because Corrales and Werner suggested that she and Mejia could help each other out:  Castro would help Mejia get a green card and Mejia would, in turn, help Castro with her children.  *Colgan II*, ECF No. 20-1 at 20–22.  When Plaintiffs' counsel pointed out that Castro's I-130 petition for Mejia contained a section setting forth warnings about marriage fraud and penalties for perjury for making a false statement, and that by signing the I-130 form, Castro was stating that her marriage to Mejia was, in fact, *bona fide*, Castro admitted that she lied when signing the form and had perjured herself.  *Id.* at 28–29.  Castro explained that she was not lying at her deposition "because [she] would like this to be done with."  *Id.* at 29.  Castro's testimony thus creates more than a simple reasonable inference of fraud: it is direct evidence of fraud, to which Castro has consistently adhered—even when knowing that admitting to such fraud could place her in jeopardy.

It bears noting that the deposition transcript could support an inference that Castro may have been pressured into giving her May 23, 2016, statement to immigration authorities in which she first admitted the marriage was not *bona fide*, as she testified that officials "said that they would take [her] kids away" and that she could "get in big trouble for lying."  *Id.* at 44.  Even assuming it was obtained through improper pressure, though, USCIS expressly excluded that statement, and Castro's April 2019 telephonic statement, from its readjudication process.  *See Colgan II*, ECF No. 1-5 at 3 ("After reviewing the evidence and the testimony provided at the interview, including all evidence provided in response to the Notice of Intent to Deny (NOID), the BIA, and the U.S. District Court, *but excepting Jessica's prior statements and any analysis of such statements found in previous NOIDs or decisions*, our records indicate that the beneficiary is not eligible for the requested benefit…") (emphasis added).  Thus, any potential impropriety relating to the May 2016 statement is of no consequence to the agency's readjudication decision.

Based on the record before it, the Court concludes that there was substantial and probative evidence supporting the agency's conclusion that Mejia's prior marriage to Castro was entered into to obtain an immigration benefit, and was therefore a bar to approval of Colgan's I-130 petition filed on her behalf.  That Plaintiffs disagree with the conclusions the agency drew from Castro's testimony does not mean the agency acted arbitrarily or capriciously.  *See Singh*, 724 F. App'x at 39 ("the agency has significant discretion over the weight to be afforded to the evidence before it, and the probative value it assigned does not rise to the level of an abuse of discretion, particularly in light of the deference we afford in the context of marriage fraud").

For these reasons, Plaintiffs' motion for summary judgment is denied insofar as it argues Defendants' decision was arbitrary and capricious under the APA, and Defendants' motion arguing the opposite is granted.

## V.      VIOLATION OF DUE PROCESS

The Court next turns to Plaintiffs' argument—advanced primarily in *Colgan I*—that Defendants violated their Fifth Amendment right to due process of law by denying the I-130 petition without affording them the opportunity to fully examine and rebut Castro's actual statements during the May 2016 interview and April 2019 phone call, as opposed to the summaries of those statements provided in the NOID and 2020 decision.  While this issue may be moot because the agency did not rely on either statement in making its 2024 decision, the Court nonetheless addresses it, and holds that Plaintiffs were not denied due process.

### A.   Legal Standard

When a plaintiff alleges he or she was deprived of a property interest without due process of law, the Court must determine: "(1) whether [the plaintiff] possessed a liberty or property interest and, if so (2) what process he was due before he could be deprived of that interest."

*Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002). While the Constitution guarantees that property rights will not be infringed without due process of law, "[p]roperty interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). "In order to have had a property interest in [a sought-after benefit], [a plaintiff] must have had 'a legitimate claim of entitlement to it.'" *Ciambriello*, 292 F.3d at 313 (quoting *Roth*, 408 U.S. at 577). And "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005).

B.  <u>Protected Property Interest</u>

The Second Circuit has not decided the issue of whether persons similarly situated to Plaintiffs have a constitutionally protected liberty or property interest in having their Form I-130 petition granted.[7] This is the relevant inquiry because, "in order to make a valid due process claim, a claimant must show a constitutionally protected liberty or property interest in the outcome of the proceedings." *Gadria v. Gantner*, No. 05 Civ. 6621 (NRB), 2008 WL 650369, at *4 (S.D.N.Y. Mar. 6, 2008). Stated another way, "process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona,* 461 U.S. 238, 250 (1983). Generally, "entitlement turns on whether the issuing authority lacks discretion to deny the permit, i.e., is required to issue it upon ascertainment that

---

[7] The Court is aware that several courts in this circuit have noted that the question of whether a petitioner has a liberty or property interest in "seeing their immigration applications adjudicated pursuant to a specific procedure" is an open question in the Second Circuit. *See, e.g., Saleh v. Garland*, No. 21-CV-5998 (PKC), 2022 WL 4539475, at *6 n. 8 (E.D.N.Y. Sept. 28, 2022) (collecting cases); *Caplash v. Johnson*, 230 F. Supp. 3d 128, 139 (W.D.N.Y. 2017) (noting this open question before holding there is a "constitutionally protected property interest" in "the adjudication of Plaintiff's Form I-130 petition."). For the reasons explained above, however, this is not the relevant inquiry here.

certain objectively ascertainable criteria have been met." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999); *see also Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 59 (2d Cir. 1985) ("whether an applicant has a legitimate claim of entitlement to the issuance of a license or certificate should depend on whether, absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted").

In order to determine whether Plaintiffs have a constitutionally protected liberty or property interest, the Court must "'look to the statutes and regulations governing the distribution of benefits' and determine whether 'those statutes or regulations meaningfully channel official discretion by mandating a defined administrative outcome.'" *Bellin v. Zucker*, 6 F.4th 463, 475 (2d Cir. 2021) (quoting *Kapps v. Wing*, 404 F.3d 105, 113 (2d Cir. 2005)). The Second Circuit has identified two distinct scenarios where discretion comes into play. First, there are situations where "a decision-maker's ultimate power to decide—the power to grant or deny a benefit regardless of whether particular criteria are met," is entirely unrestrained. *Bellin*, 6 F.4th at 476. In such a situation, no protected liberty or property interest is implicated and thus "a procedural due process claim based on the decision-making process will fail." *Id.* Alternatively, "'discretion' may refer to the extent to which criteria govern and limit a decision-maker's power to decide." *Id.* In this situation, the Court must determine whether such limitations "'meaningfully channel official discretion' to an extent sufficient to create a property interest." *Id.* (quoting *Kapps*, 404 F.3d at 113). Here, it is clear from the statutory language that USCIS's discretion is not unfettered, insofar as it provides that the agency "shall" approve the petition if, after investigation, it finds "the facts stated in the petition are true and that the alien in behalf of whom the petition is made is an immediate relative." 8 U.S.C. § 1154(b). Thus, the question before the Court is whether the statute "meaningfully channels" the agency's discretion, such that a liberty or property interest is created.

The Court cannot conclude the authority of USCIS is so channeled.  As noted, 8 U.S.C. § 1152(b) requires the Attorney General to conduct "an investigation of the facts" and grant the petition only if "he determines that the facts stated in the petition are true."  Such a command necessarily requires that the Attorney General, and by extension USCIS, exercise some amount of discretion in each and every case to evaluate whether facts are true.  It is not simply a rote application of objective factors to determine whether a person qualifies for a government benefit. *Cf. Kapps*, 404 F.3d at 114 (holding that state law providing objective factors which, when met, required conferral of a benefit, created a protected property interest).  Here, USCIS is required to conduct an independent investigation and, upon conclusion of that investigation, determine whether a given applicant is entitled to a benefit.  Further still, if the results of that investigation lead USCIS to determine that a beneficiary had previously attempted to avoid immigration laws by entering a non-*bona fide* marriage, the Attorney General is *prohibited* from approving the application.  8 U.S.C. § 1154(c).  In the face of such a scheme, it simply cannot be said that "absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted."  *Yale Auto Parts*, 758 F.2d at 59.

In arguing that they have a protected property interest, Plaintiffs rely heavily on *Ching v. Mayorkas*, 725 F.3d 1149 (9th Cir. 2013).  *See Colgan I*, Pls.' Mot. for Summ. J., ECF No. 36-1 at 11–16.  There, the Ninth Circuit held that a petitioner had a protected property interest in the granting of an I-130 petition despite a statement from a former spouse indicating that a prior marriage was fraudulent, in circumstances factually similar to those present here.  *Ching*, 725 F.3d at 1155.  *Ching*, which relied on Ninth Circuit precedent that establishes "determinations that require application of law to factual determinations are nondiscretionary," *id.* (cleaned up), is not binding on this Court.  More importantly, as discussed above, the Second Circuit does not

characterize what qualifies as nondiscretionary as broadly as the Ninth Circuit. Instead, the Second Circuit requires the statutory scheme to meaningfully channel the decisionmaker's autonomy before it creates a property interest. *See Bellin*, 6 F.4th at 476. Here, where the statutory scheme requires a factual investigation, and only upon the satisfactory completion of this investigation is the I-130 petition granted, the agency's discretion is not so channeled. Therefore, the Court concludes Plaintiffs do not have a constitutionally protected liberty or property interest in the granting of their I-130 petition and are not required to receive any process under the Constitution.

Even if the Court's conclusion as to whether Plaintiffs have a constitutionally protected property interest was incorrect, though, Plaintiffs were given all the process they were due. To recap, the process provided was as follows: (1) the agency issued the NOID, which provided a summary of the evidence on which the agency relied to conclude that the marriage fraud bar applied, including a quoted statement from Castro's May 23, 2016, interview in which she admitted the marriage to Mejia was not *bona fide*, and a summary of an April 4, 2019 phone call between immigration officers and Castro; and (2) Plaintiffs were allowed the opportunity to submit evidence to rebut the agency's conclusion—which Plaintiffs did. Plaintiffs were not, however, provided Castro's underlying statement from the May 23, 2016, interview nor a recording or transcript of the April 4, 2019, phone call. It is the denial of access to these pieces of evidence that Plaintiffs allege resulted in a due process violation. *See Colgan I*, ECF No. 36-1 at 8.

The question of whether the process provided was sufficient is governed by *Matthews v. Eldridge*, which requires courts to consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335 (1976).

Here, it is clear that the private interest affected by the agency's decision is significant, as it affects Mejia's legal status within the United States (and her ability to, forever and in perpetuity, gain legal status through an I-130 petition).

But the risk of erroneous deprivation of the private interest through the procedures used does not weigh in favor of finding a due process violation under these particular circumstances. The relevant regulation makes clear that an applicant must be made aware of "derogatory information" considered by the agency, and be "offered an opportunity to rebut the information and present information in his/her own behalf and before the decision is rendered."  8 C.F.R. § 103.2(b)(16)(i).   The Second Circuit, relying on a BIA decision, has held that the "actual documents are not required to be disclosed."  *Koffi*, 487 F. App'x at 660; *In re Liedtke*, A070 656 080, 2009 WL 5548116 (B.I.A. Dec. 31, 2009) ("the regulations do not place upon USCIS a requirement that the actual documents be provided to a petition in order to comply with due process").  While neither *Koffi* nor *Liedtke* considered the precise procedural due process question at issue here, their affirmation of the regulation's requirements as affording sufficient process are persuasive.  And, as Defendants note, the NOID provided Plaintiffs the exact language of Castro's May 23, 2016, statement, *see Castro I*, Defs.' Opp'n, ECF No. 37 at 2–3, so it is not clear what Plaintiffs would gain from any supplemental memorialization of the statement.  To the extent Plaintiffs argue they were deprived of the "full content" of the statement until they received it as part of the administrative record in this case, they do not endeavor to argue that that the full content somehow contradicts the quoted language of the statement or paints the statement in a different light.  *See Colgan I*, ECF No. 36-1 at 14.  Thus, they have demonstrated no prejudice from the withholding of the full May 2016 statement.

And as to the April 2019 phone call, there is no evidence in the record that the call was recorded or transcribed, so there is no better evidence than the summary the NOID provided. Finally, and importantly, Plaintiffs were given (and availed themselves of) the opportunity to rebut the quoted May 2016 language and the summary of the April 2019 phone call. Thus, when weighing the risk of erroneous deprivation and the value of the additional safeguards Plaintiffs request in this particular case, the Court cannot conclude that this second *Matthews* factor supports a finding that the process employed was inadequate.

Even crediting Plaintiffs' assertion that USCIS could "easily" have provided the statements at issue to them so that they could rebut them when responding to the NOID, ECF No. 36-1 at 14, the Court cannot conclude that Plaintiffs were denied due process, for the reasons explained above with respect to the second *Matthews* factor. And, in any event, to the extent the agency did not rely on either Castro's May 2016 or April 2019 statements when making its 2024 decision, Plaintiffs have no colorable argument that their due process rights were violated with respect to the agency's ultimate, readjudicated decision.

Thus, the Court rejects Plaintiff's due process argument, to the extent it is a live issue.

## VI.    CONCLUSION

For the reasons discussed herein, Defendants' supplemental motion for summary judgment, ECF No. 20, is GRANTED, and Plaintiffs' supplemental motion for summary judgment, ECF No. 21, is DENIED. The Clerk of Court is directed to enter judgment for Defendants and close this case.

**SO ORDERED** at Hartford, Connecticut, this 30th day of September, 2025.

   */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE